UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ROBERT I. TOUSSIE and CHANDLER PROPERTY,
INC.,

                        Plaintiffs,                     **ORDER**
                                                               CV 01-6716 (JS)(ARL)

       -against-

COUNTY OF SUFFOLK, ROBERT J. GAFFNEY,
individually and in his official capacity as Suffolk
County Executive, ALLEN GRECCO, and
PEERLESS ABSTRACT CORP.,

                        Defendants.
-------------------------------------------------------------X
ROBERT I. TOUSSIE, LAURA TOUSSIE,
ELIZABETH TOUSSIE, MICHAEL I. TOUSSIE,
PRAND CORP. f/k/a CHANDLER PROPERTY, INC.,
ARTHUR A. ARNSTEIN CORP., TOUSSIE LAND
ACQUISITION & SALES CORP., and TOUSSIE
DEVELOPMENT CORP.,

                        Plaintiffs,
      -against-

COUNTY OF SUFFOLK, PAUL SABATINO, II,
PATRICIA B. SIELINSKI, and THOMAS A. ISLES,

                        Defendants.
-------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

**I. INTRODUCTION**

     Before the court is the fifth in a series of motions in which the plaintiffs seek discovery sanctions for the failure of the Suffolk County defendants (the "County") to produce e-mails. In making this determination, the court has been challenged to reconcile a party's obligation to preserve relevant evidence with the unique nuances of electronically stored information. Guided by general spoliation principles, the court now determines whether the County should be penalized for losing and/or destroying its e-mails.

## II. BACKGROUND

The plaintiffs, Robert Toussie and Chandler Property, Inc., began this action in October 2001, asserting that their civil rights had been violated when the defendants denied them the opportunity to purchase thirty-one parcels of real estate at the 2001 Suffolk County Surplus Auction. Amended Complaint 01-6716 [Doc. No. 45]. In April 2005, the plaintiffs, joined by others, commenced a second action asserting similar claims under 42 U.S.C. §1983. Complaint 05-1814 [Doc. No. 1]. The 2005 complaint alleged that the defendants violated the plaintiffs' civil rights when they blocked the sale of 15 parcels in 2002, the sale of adjacent property in 2003, and barred the plaintiffs' attendance from public auctions in 2004. As they had in the 2001 complaint, the plaintiffs also asserted several state law claims including, among other things, breach of contract, unjust enrichment, and defamation. On May 18, 2007, the court consolidated the 2001 and 2005 actions in the interest of judicial economy. [Doc. No. 182].

The e-mail dispute was first brought to the court's attention in August 2006, several months before the motion for consolidation had been decided. By letter application, the plaintiffs moved to compel the County to supplement its response to the plaintiffs' First Request for the Production of Documents. [Doc. No. 112]. Counsel for the plaintiffs argued that the County had failed to perform a diligent search for responsive documents, evidenced by the fact that it had only produced two e-mails. *Id.* at 1. In an effort to resolve the dispute, the court held a conference on September 5, 2006. During the conference, counsel for the County suggested that since it was "more the exception than the rule," that employees were "communicating be email," a further search was unlikely to uncover additional e-mails. 9/5/06 Tr. at 11. Because it became clear that the County had failed to conduct a system wide search for responsive e-mails, the court

directed the County to have its Information Technology Department search the County's servers for responsive e-mails. [Doc. No. 120].

On October 31, 2006, the plaintiffs moved for sanctions pursuant to Fed. R. Civ. P. 37(b)(2)(A)[1], contending that the County had willfully failed to comply with the court's September 5th ruling, and subsequent October 10, 2006 order, which directed the County to supplement its production of e-mails. [Doc. No. 133; Doc. No. 51, CV 05-1814]. In response, the County submitted an affidavit from Douglas Miller ("Miller"), its Director of Management Information Services, explaining that the County lacked the resources to perform the court ordered search for additional e-mails. [Doc. No. 138, Ex. E]. Miller explained that the County did not have a system for archiving e-mails. Specifically, he indicated that:

> It is important to understand the significant difference between backed up data and archived data. Our data backup system is designed to save data in the case of emergency situations where data is lost and needs to be restored. Data is backed up in tape format each month. An archiving facility assembles e-mail into a form that can be retained in a searchable format over a period of time. Since the County has no archiving facility, only data backup tapes are available to be searched.

---

[1] Fed. R. Civ. P. 37(b)(2)(A) provides:

> If a party . . . fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> (A) An order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order; . . . .

The court notes that the language of this and many other rules was amended effective December 1, 2007.

3

> Backed up data has to be restored to its original location to be accessed. . . . Consequently, it would be necessary to purchase hardware and software necessary to create a duplicate non-production backup system and storage staging area, at a cost of approximately $20,000. It would also be necessary to purchase hardware and software necessary to create a non-production e-mail server to allow the restored data to be accessible, at a cost of $12,000.

Miller Aff. at ¶¶ 4-5. Miller noted that before 2006, back up tapes were not labeled or catalogued, which required that each tape be fully copied for review. He added that because the County's current back up system used different size tapes, the copying of any back up tapes would require new equipment and take as much as 1700 man hours to search. *Id.* at ¶¶ 6-9.

Upon receipt of the County's response, the court held another conference on November 21, 2006. At that conference, the court expressed its exasperation with the County's position by noting, "You can't just throw up your hands and say we don't store [e-mails] in an accessible form and then expect everybody to walk away." "The question is, how can a plan be implemented to provide for some production." 11/21/06 Tr. at 3. After narrowing the scope of the e-mail search, the court issued an order directing the County to prepare a search plan. [Doc. No. 151]. The search plan was to include an estimate of the cost, manpower, and time needed to conduct a search for e-mails responsive to 35 search terms on the servers of five key County departments for the period May, 2001 thru January, 2006. *Id.*

By letter dated November 30, 2007, the County advised the court that in order to perform the search outlined on November 21st, it would be necessary to restore 470 back up tapes, which required a new system to be purchases at a cost of approximately $934,000. [Doc. No. 155]. The County estimated that the search would take 960 man hours to complete. *Id.* The County

4

also noted that it had explored the possibility of hiring an outside consultant to perform the search and learned that to do so would cost between $617,000 and $672,000. *Id.*

The court held another conference on December 4th to address this issue. At this conference, the court reiterated its concern that, notwithstanding the County's clear obligation to preserve relevant e-mails, the County had taken no steps to preserve its e-mails or to store them in a manner which would permit ready access and review. 12/4/06 Tr. at 35-36. Of particular concern was Miller's testimony that back-up tapes were made at the end of each month and would not reflect e-mails deleted before the end of each month. *Id.* at 37-38. Notwithstanding these concerns, the court directed the parties to meet with their respective information technology consultants to discuss how to implement a better, and perhaps less costly plan, for this production. *Id.* at 39. The court further directed the parties to submit a joint amended search plan to the court. *Id.*

Pursuant to the court's order, the parties did participate in a telephone conference with their IT professionals on December 14, 2006. However, rather than submitting a joint search plan, the plaintiffs renewed their request for sanctions. [Doc. No. 161]. Based on information gleaned from the parties' conference call, the plaintiffs outlined examples of how the County had neglected their discovery obligations. The plaintiffs argued that:

> 1. The County had not considered the need to search for e-mails generated from the County Legislature despite their contrary statement in the November 30, 2007 search plan;
>
> 2. The County did not keep all of its electronic data backed up; rather, it had a practice of overwriting and deleting back up tapes even after the litigation had commenced;
>
> 3. The County's IT professional was still unable to answer

5

> questions during the call concerning the number of servers or the software programs used for back up tapes;
>
> 4. The County did not label or bar-code any of the back up tapes making it impossible to identify specific data on a particular back up tape;
>
> 5. The County included misleading information in the November 30th submission such as identifying back up tapes outside of the relevant period; and
>
> 6. The County failed to explain how its estimate for conducting the e-mail search changed from $36,000 to $934,000.

*Id.*

The County did submit an amended e-mail search plan to reflect the issues discussed during the conference. [Doc. No. 162]. Although the amended plan contained a more detailed explanation of how the search would be conducted, the approach remained relatively unchanged. The County maintained its position that "[i]n order to perform the required search of county emails, for the period of time from May 12, 2001 to January 1, 2006, it will be necessary to catalog and restore 412[2] tapes and place the data on large storage devices [at a cost of $934,000 and] . . . will require two full time staff members to work on the project , for 445 days, [and] . . . [o]nce the data is restored . . ., it will require a detective from the Police department to perform the search using the computer crime division's forensic software, full time, for at least 70 weeks." *Id.* at 3. In other words, the County estimated that it would take approximately two and one-half years to restore the e-mails and complete the production.

---

[2]The County often changed the number of the back up tapes in their correspondence to the court. At times, the County indicated that there were 470 tapes. *See* Letter dated Nov. 30, 2007. At other times, the number was 412. *See* Petrowski 1/8/07 letter at 3. In the end, 417 tapes were examined.

It was clear from the parties' submissions that notwithstanding the court's instructions, the County had not really attempted to outline a more efficient plan for the e-mail search. Accordingly, the court scheduled a hearing for February 2, 2007, and directed the parties to bring their IT people to answer the court's questions concerning the technical aspects of reproducing the material. [Doc. No. 164]. The court made clear that it would not address the plaintiffs' spoliation motion before it resolved the question whether a search plan could be reasonably implemented. *Id.*

At the hearing, the County reported for the first time that sometime in 2004 a water pipe had burst where the back up tapes were stored causing damage to the tapes.[3] The County stated that it sampled four of the 420 tapes and found that three were not readable. 2/7/07 Tr. at 16. Although the County initially suggested that the restoration process would be futile, it nonetheless agreed to solicit bids and hire an outside vendor to recover the e-mails. This sea change in the County's willingness to go forward followed the court's warning that the County faced an adverse inference at trial with respect to the missing e-mails. At the hearing, the court also addressed the County's practice of overwriting tapes. In this regard, Miller testified that the County Executive's Office, one of the four targeted departments, overwrote its back up tapes every ten days. 2/7/07 Tr. at 48. Miller also testified that the County Legislature had a similar practice until 2005 after which time they began saving one tape per month. 2/7/07 Tr. at 49-50. Finally, Miller confirmed that e-mails generated between 2001 and 2006 from the County Attorney's Office and the Real Estate and Planning Department were backed up monthly and

---

[3] The County did not explain why it took over six months to realize that the documents at issue were potentially damaged by a flood in 2004.

should appear somewhere on the 417 back up tapes assuming they were not destroyed by the flood. 2/7/07 Tr. at 53.

At the conclusion of the hearing, the court issued an order directing the County to obtain bids from third-party litigation support companies with respect to the e-mail restoration and to report back to the court which firm was chosen. [Doc. No. 165]. By letter dated February 20, 2007, the County notified the court that it had solicited a proposal from Kroll On Track, which estimated that the cost of the retrieval would range from $418,000 to $963,500, but did not state whether Kroll had in fact been retained to do the work. [Doc. No. 167]. Accordingly, the court was required to schedule another conference for March 22, 2007.

At the March 22nd proceeding, counsel for the County reported that:

> 1. The computers of key players in the Real Estate Department had been accessed and the County was able to recover available e-mails of Jim Burke, Allan Greco, Ms. Costigan, Tom Isles, Theresa Allar and Pat Selinski which were disclosed to plaintiffs.
>
> 2. A formal litigation hold was not circulated to key departments to insure the preservation of relevant electronic data.
>
> 3. The County obtained approval from the County Executive to retain the services of Kroll On Track which was expected to cost a minimum of $418,000.

3/22/07 Tr. at 4-10, 18-20, 21-23. The County also reported that the water pipe break which occurred in January 2004 had damaged only one tray of tapes. *Id.*

At this same proceeding, Miller gave somewhat contradictory testimony concerning the e-mail storage systems of the County and the Real Estate Department. Ultimately, he confirmed that for the years 2001-2005 for the relevant departments, unless an e-mail was specifically deleted prior to the end of the month, it would appear on one of the back-up tapes the County

was prepared to restore. 3/22/07 Tr. at 57. With respect to the e-mails recovered from the hard drives at the Real Estate Department, Miller could not confirm that the retrieved e-mails represented all the e-mail traffic, as it was now impossible to discover what server instructions were in effect at that time. 3/22/07 Tr. at 37- 40. Accordingly, by the close of the fourth hearing, the County assured the court that the restoration process would produce e-mails from the four targeted departments with the exception of those e-mails that had been intentionally deleted by a user before the end of each month or any e-mails stored on any flood-damaged tapes.

Following the hearing, the County advised the court that the Suffolk County Legislature had passed a bill to cover the expense of the tape restoration and that a draft contract would be forwarded to Kroll On Track by May 2, 2007. [Doc. No. 176]. By letter dated May 10, 2007, the plaintiffs again renewed their motion for sanctions arguing that the County's status letter just was another attempt to delay discovery and that a sufficient basis already existed to award the plaintiffs sanctions. [Doc. No. 178]. In response, the court directed the County to notify them how long Kroll would need to complete the restoration and reserved decision on the spoliation motion. [Doc. No. 179]. Finally by letter dated May 18, 2007, the County advised the court that it would take fourteen days to restore the tapes and sixty days to complete the entire retrieval process. [Doc. No. 180]. Accordingly, the court directed the County to provide all outstanding e-mail discovery to the plaintiff by August 10, 2007. [Doc. No. 183].

Kroll has restored 417 back up tapes and searched for e-mails responsive to the criteria set by the court. 18 of the 417 tapes were damaged and Kroll was required to implement disaster recovery procedures on those tapes. Data from 2 of the 18 damaged tapes was ultimately recovered. Kroll also determined that 20 additional tapes were in "brick format," meaning they

could not be converted into a readable format. Thus, Kroll was unable to recover e-mails from approximately 36 tapes or 9% of the tapes.

In the end, the Kroll process yielded 2403 pages of e-mails and attachments to those e-mails, of which approximately 200 were withheld on the basis of privilege, a far cry from the two e-mails originally produced by the County. The plaintiffs contend, however, that the County has produced far fewer than the claimed "2,197 e-mails" given that most of those pages are "inane" attachments to e-mails. They further argue that even after the restoration, the County's total production could not possibly represent the e-mails exchanged by dozens of people in the targeted departments. They note, for example, that according to other documents produced, one of the key players, Mr. Burke, should alone have had 1200 e-mails in his inbox. Moreover, the plaintiffs contend that not a single e-mail was recovered directly from the County Legislatures' server although there is evidence that such e-mails existed. Finally, the plaintiffs argue that the destruction of e-mails is evident from the fact that the County was able to produce e-mails sent from one key player to another, but the e-mail that should have been received is missing.

In the instant motion, the plaintiffs continue to argue that had the County implemented a litigation hold and discontinued its practice of overwriting tapes, more relevant e-mails would have been preserved. [Doc. No. 184]. Consequently, the plaintiffs ask that the undersigned recommend that a default judgment be entered against the defendants or, in the alternative, that an adverse instruction be given to the jury chosen to hear this case. The County contends that it has not engaged in spoliation and should not be sanctioned. [Doc. No. 186]. It claims that it has made enormous efforts, at a substantial monetary cost, to fulfill its obligations and that there has been no destruction or untimely production of evidence. *Id.*

## III. DISCUSSION

### A. Spoliation Standards

Pursuant to Fed. R. Civ. P. 37(b) and the court's inherent powers, a federal court may impose sanctions when a party spoliates evidence. *See Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 106-07 (2d Cir. 2002); *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999). "Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West,* 167 F.3d at 779. The court has broad discretion in crafting an appropriate sanction for spoliation. *Id. (*citing *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir. 1998). However, "the sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudicial party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" *Id.*

"A party seeking an adverse inference instruction (or other sanctions)[4] based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind' and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." Zubulake*,* 229 F.R.D. 422, 430 (S.D.N.Y. 2004). The

---

[4]Although the entry of a default judgment is within the court's discretion, a default judgment is generally not entered unless the party to be sanctioned has acted willfully, in bad faith or is otherwise culpable. *See Luft v. Crown Publishers, Inc.,* 906 F.2d 862, 865 (2d Cir. 1990).

11

court's analysis begins with a discussion regarding the County's duty to preserve evidence.

**1. Duty to Preserve**

In general, "the obligation to preserve evidence arises when [a] party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Zubulake v. *UBS Warburg LLC,* 220 F.R.D. 212, 216 (S.D.N.Y. 2003); *see also Fujitsu Ltd. V. Federal Exp. Corp.,* 247 F.3d 423, 436 (2d Cir. 2001). At times, the duty to preserve arises prior to the filing of a complaint; at the point in time when a defendant first anticipates litigation. But when the defendant is a firm, or, as here, a municipality, a firm or municipal-wide duty to preserve is not imposed simply because one or two employees contemplate the possibility of litigation. *See* Zubulake*,* 220 F.R.D. at 217. In this case, it is likely that a handful of County employees anticipated that the plaintiffs would sue after they were denied the right to purchase real estate at the 2001 auction, but there is no evidence to suggest that a substantial number of key personnel anticipated litigation prior to October 11, 2001. Accordingly, the duty to preserve arose in October 2001, when the complaint was first filed.[5]

Once that duty arose, the County was under an obligation to preserve any "unique" and "relevant" evidence. *Id.* Although the County was not required to backup every e-mail it generated, it did have the duty to preserve "what it [knew], or reasonably should [have known], [was] relevant in the action, [was] reasonably calculated to lead to discovery of admissible

---

[5]It goes without saying that this duty was at first limited to documents relevant to the County's decision to deny the plaintiffs the opportunity to purchase real estate at the 2001 auction. In 2002, 2003 and again in 2004, the duty would have then been respectively extended to cover documents relevant to the County's decision to block the sale of parcels sold at the 2002 auction, to block the sale of adjacent surplus property in 2003, and to bar the plaintiffs' attendance from public auctions in 2004.

evidence, [was] reasonably likely to be requested during discovery and/or [was] the subject of a pending discovery request." *Id*. Simply stated, any documents prepared by or for County employees, employed in the four key departments, which involved the Toussie transactions, should have been preserved.

The courts recognize that there are many ways to preserve electronic data and a litigant is free to choose how to do so. *Id*. at 218. However, once the duty to preserve attaches, at a minimum, a litigant is expected to "suspend its routine document and retention/destruction policy and to put in place a litigation hold." *Id.; see also Doe v. Norwalk Cmty Coll.,* 2007 U.S. Dist LEXIS 51084 * 14 (D. Conn. July 16, 2007)(a party needs to act affirmatively to prevent its system from destroying information even if such destruction would occur in the regular course of business). Those steps were not taken by the County. To begin with, the County did not alter its document and retention procedures in any way as a result of the lawsuit. While the evidence gleaned from the County's IT professional was somewhat confusing, what clearly emerged from the testimony was that even after the lawsuit was filed, the County continued to save electronic data in a virtually inaccessible format. [Doc. No. 138, Ex. E].

Moreover, the testimony given by the County regarding its back up practices was not clear. Miller initially testified that both the County Executive and County Legislature overwrote its back up tapes every ten days. 2/7/07 Tr. at 48-50. By contrast, he later testified that all of the e-mails generated by these departments would have been captured on the 417 back up tapes because they passed through a central hub. 3/22/07 Tr. at 50-60. Nonetheless, even if the court were to disregard the issue concerning the practice of overwriting tapes given the County's assurances, the fact remains that the County did nothing to alter its document retention policy to

insure the availability of relevant discovery.

Indeed, even after the County had received a document request, key personnel remained free to delete documents from the system because the County failed to put in place a litigation hold. The County admits that no formal litigation hold was ever effectuated, but contends, nonetheless, that "relevant County employees (*i.e.* "key players") were sensitive to the circumstances surrounding any transactions with the Plaintiff Robert Toussie . . . [and it] is evident that all key players preserved important documentation without formal instruction by virtue of the numerous e-mails produced from their personal drives . . . ." [Doc. No. 186 at 5]. The County's claim is undermined by Miller's testimony who could not state with any certainty that the e-mails were all captured and, in any event, the County's claim only involved the Real Estate Department leaving several County key departments unaccounted for. 3/22/07 Tr. at 37-40. For these reasons, the court finds that the County breached its duty to preserve and moves to the second prong of the spoliation test.

**2. Culpable State of Mind**

A party seeking spoliation sanctions must also show that "the records were destroyed with a culpable state of mind." *Zubulake,* 229 F.R.D. at 430 (citing *Byrnie v. Town of Cromwell,* 243 F.3d 93, 107-12 (2d Cir. 2001). In this circuit, this prong of the spoliation test can be "satisfied by showing that evidence was knowingly . . . or negligently" destroyed. *Residential Funding Corp.,* 306 F.3d at 108. The plaintiffs argue that the County's spoliation was grossly negligent. They contend that because counsel never informed key employees of the need to maintain relevant e-mails, key employees were free to delete e-mails from the hard drives, back up procedures remained unchanged, and highly relevant e-mail exchanges were lost.

14

In limited respects, the plaintiff's are correct. The law is very clear that the failure to implement a litigation hold at the outset of litigation amounts to gross negligence. *Heng Chan v. Triple 8 Palace,* 2005 U.S. Dist Lexis 16520 * 19 (S.D.N.Y. Aug. 11, 2005)(Francis, M.J.); *Zubulake,* 220 F.R.D. at 221. In fact, once a litigation hold is implemented, counsel is then required to oversee compliance with the litigation hold and to monitor the party's efforts to retain and produce relevant documents. *Zubulake,* 229 F.R.D. at 432. Although the County may have, as they claim, mitigated, in part, the failure to preserve by restoring some of the tapes, there is no question that key employees were free to delete documents and e-mails were destroyed when the County's basement flooded.

However, the court has not lost sight of the fact that the e-mails were being preserved on back up tapes intended for disaster recovery purposes. Although the law is now clear that any back up tapes containing the documents of a key player must be preserved and accessible, *see id.,* the law with respect to back up tapes was not clear in 2001. *Zubulake,* 220 F.R.D. at 220 (whether duty to preserve extends to back up tapes has been grey area). Thus, while the County's failure to implement a litigation hold amounts to gross negligence, its failure to preserve all potentially relevant back up tapes was "merely negligent." *Id.* In either case, the second requirement for the imposition of spoliation sanctions is met.

**3. Relevance**

Finally, to establish the third prong of the spoliation claim, the plaintiffs must establish that the missing e-mails were relevant evidence and that the destroyed evidence would have been favorable to them. *Id.; see also Zubulake,* 229 F.R.D. at 430.[6] In this context, the term

---

[6] The third prong of the spoliation test is especially important in cases where the destruction was caused by negligence or even gross negligence. *Zubulake,* 220 F.R.D. at 221. Mental culpability is evidence of relevance only where willful spoliation is shown. *Id.*

15

"relevance" "means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." *Residential Funding Corp.,* 306 F.3d at 108-09. To obtain an adverse inference, the destroyed evidence must "have been of the nature alleged by the party affected by the destruction." *Id*. In other words, the plaintiffs here must present extrinsic evidence tending to show that the destroyed e-mails would have been favorable to their case. *Zubulake,* 220 F.R.D. at 221 (citing *Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 77 (S.D.N.Y. 1991)("Where, as here, there is no extrinsic evidence whatever tending to show that the destroyed evidence would have been unfavorable to the spoliator, no adverse inference is appropriate.")).

The plaintiffs first argue that relevance has been established as a matter of law. Specifically, they contend that "the County's destruction of evidence through its grossly negligent failure to implement a litigation hold is sufficient, in itself, to establish relevance." While it is true that under certain circumstances "a showing of gross negligence in the destruction or untimely production of evidence" will support a claim that the missing evidence was favorable to the movant, the circumstances here do not warrant such a finding. *Residential Funding Corp.,* 306 F.3d at 109 (citing *Reilly v. Natwest Group, Inc.,* 181 F.3d 253, 267-68 (2d Cir. 1999)(granting adverse inference where spoliator sanitized files); *see also Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1064 (2d Cir. 1979)(holding plaintiff's gross negligent conduct which froze litigation for four years justified preclusion of evidence related to damages). There is no question that the County 's early foot dragging delayed this litigation and that the County failed to implement a litigation hold. This conduct, however, does not rise to the egregious level seen in cases where relevance is determined as a matter of law. The courts analysis, thus, turns to the extrinsic evidence offered by the plaintiffs to show that the destroyed e-mails would have been favorable to their case.

16

In this regard, the plaintiffs have annexed six e-mails to their application, which they argue demonstrate the County's improper motivations and retaliatory conduct toward the plaintiffs. Presumably, the plaintiffs chose to annex these six e-mails because they believed them to be the most relevant among the e-mails produced. Yet, the court finds that, if anything, the e-mails were more favorable to the defendants' case. The six e-mails singled out by the plaintiffs include the following pertinent references:

> The Ways and Means Committee will very likely be considering the resolution to transfer the Toussie' parcels next Monday. This is the resolution that was tabled from the last meeting and has been followed by the media due to an investigation of the company by federal agencies. It is also the company that involved Allan Grecco's situation.
>
> The resolution was submitted prior to our knowledge of the federal investigation regarding Mr. Toussie and his company. In light of this I am open to any suggestions you may have . . . . (Ex. H.)
>
> I read you article. Newsday is bound and determined to make [A]lan look like a criminal, . . . . He doesn't seem terribly guilty, Toussie, however, is a rat. He is despicable, charging that kind of inflation on the property. . . . (Ex. I)
>
> Toussie is setting us up for another lawsuit if the legislature does not allow him to buy parcels at the auction. (Ex. J)
>
> I am looking for a date for us to do a news conference re: Dam Pond out in East Marion. . . . Would you please check this one to be sure its squeaky clean, not Toussie tainted . . . . (Ex. K)
>
> I note that one parcel [in Carmen's River Watershed] is in the apparent ownership of Robert Toussie. In view of the pending litigation with the County involving this individual, please touch base with the County Attorney before any action is taken . . . . (Ex. L)
>
> We ordered appraisals for the Ross property on 1-3-05. We are still working on the Mastic Shirley conservation area. The largest landowners are Toussie (we cannot deal with them), Reckson (not interested), and Stubeck . . . .(Ex. M).

Certainly, the e-mails suggest that Count officials disliked Robert Toussie, but they also indicate that the County became aware of an ongoing federal criminal investigation involving Toussie's

company, that this investigation and accompanying media reports played a role in the County's determination of how to handle Toussie's participation at the land auctions, that the County was concerned about the plaintiffs' business practices, and that the County was cautious about its dealings with him after he filed the instant lawsuit. In effect, the e-mails added nothing new to what was already known by the parties and all seemingly lend support to the County's defense that it barred Toussie from the auctions because of its concerns about his past and present business practices. [Doc. No. 186].

While the evidence is clear that at least 9% of the back up tapes were destroyed and the plaintiffs may be correct that e-mails have been deleted by users, there is no reason to believe that any of those e-mails would have provided any additional support of plaintiffs' claims. Accordingly, the plaintiffs have not sufficiently demonstrated that the destroyed/lost emails were favorable or relevant and the motion for a default judgment or an adverse inference instruction is denied.

**B. Costs**

As the plaintiffs note, the court has already determined that the plaintiffs are entitled to recover legal fees in connection with their October 31, 2007 motion for sanctions. [Doc. No. 151]. The County appealed that decision to the district court and the appeal is still pending. The question that remains before the undersigned, is whether the plaintiffs are entitled to be reimbursed for their subsequent motions. Although the plaintiffs have not provided sufficient evidence of relevance to warrant an adverse inference instruction, the County was initially recalcitrant in meeting its discovery obligations. The County's lack of diligence is evidenced by the fact that the County first took the position that it would not uncover more than the two e-mails initially produced . *See* 9/5/06 Tr. at 11. In addition, counsel for the County first became

aware that its back up tapes were damaged by a 2004 flood six months into these proceedings .
*See* 2/7/07 Tr. at 16. There is no question that until the February 2007 hearing, the plaintiffs were required to expend resources in litigation in order to obtain the e-mails that have now been produced, and thus, those costs are compensable. *See Doe,* 2007 U.S. Dist Lexis at * 26-27. Accordingly, the County shall also reimburse the plaintiffs for the costs associated with their appearance at the hearings dated November 21st and December 4th, as well as the preparation of their January 4, 2007 application. The plaintiffs shall submit an affidavit to the court setting forth those costs by January 11, 2008.


Dated: Central Islip, New York
       December 21, 2007

**SO ORDERED:**

_____/s/_____
ARLENE R. LINDSAY
United States Magistrate Judge